Walker v. Driven Holdings, LLC, 2017 NCBC 69.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 17981 (Master File); 15 CVS 23044;
15 CVS 23045; 15 CVS 23046; 15 CVS 23047

KEN WALKER; et al.,

        Plaintiffs,

    v.

DRIVEN HOLDINGS, LLC,

        Defendant.

**ORDER AND OPINION
DISMISSING ALL CLAIMS**

1.      THIS MATTER involves five consolidated cases: *Walker v. Driven Holdings, LLC*, No. 15 CVS 17981 (the "Ken Walker Lawsuit"); *Rauch v. Driven Holdings, LLC*, No. 15 CVS 23044; *Walker v. Driven Holdings, LLC*, No. 15 CVS 23045; *Kirby v. Driven Holdings, LLC*, No. 15 CVS 23046; and *Moran v. Driven Holdings, LLC*, No. 15 CVS 23047. Now before the Court is the Motion to Dismiss of Driven Holdings, LLC ("Motion"), which seeks to dismiss all claims in each of the cases in this consolidated action. For the reasons explained below, the Motion is GRANTED, and each of the separate cases is DISMISSED WITH PREJUDICE.

> *Milazzo Schaffer Webb Law, PLLC, by David C. Boggs and Colin R. Stockton, for Plaintiffs.*
>
> *Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP, by Jackson Wyatt Moore, Jr. and Michael W. Mitchell, and White & Case LLP, by Glenn M. Kurtz (pro hac vice) and Kimberly A. Haviv (pro hac vice), for Defendant Driven Holdings, LLC.*

Gale, Chief Judge.

## I.   FACTUAL BACKGROUND

2.    The Court does not make findings of fact on a Rule 12(b)(6) motion to dismiss. It draws the following factual summary from the relevant allegations in the amended complaints and the documents attached to and incorporated by those complaints. The allegations of the separate complaints are essentially identical except for the company that each Plaintiff worked for, the individual agreements signed by each Plaintiff, and the number of equity units alleged. (*See* Def.'s Br. Supp. Mot. Dismiss 1 n.1; Pls.' Br. Resp. and Opp'n to Mot. Dismiss 1 n.1.) Unless otherwise specified, citations to the Amended Complaint refer to the third amended complaint in the Ken Walker Lawsuit.

3.    Plaintiffs Ken Walker, Ted P. Pearce, Mark Street, Warren C. Bickers, Donald P. Rauch, Joel Walker, Tom Kirby, and Keenan V. Moran were employed by franchises owned or operated by holding company Driven Brands, Inc. ("Driven Brands"). Plaintiffs owned stock in Driven Brands and sold their interests to Defendant Driven Holdings, LLC ("Holdings") through a multiparty transaction on November 29, 2011 (the "Transaction"). Plaintiffs received as consideration a cash payment, some of which was reinvested in Holdings, and certain vested and unvested equity interests in Holdings, including a class of equity interests called "Common Units (Special Profits Interest)" ("SPI Units"). (Am. Compl. ¶¶ 5, 11; *see* Am. Compl. Ex. A(1).)

4.    Following the Transaction, Plaintiffs were employed as executives for companies maintained in Holdings' franchise portfolio. (Am. Compl. ¶ 15; Am.

Compl. Ex. A(1).) Each Plaintiff's employment was terminated. (Am. Compl. ¶ 15.) Ken Walker and some but not all of the remaining Plaintiffs executed severance agreements at the time of their termination. (*See* Second Kurtz Aff. Ex. B.) All Plaintiffs but Ken Walker later executed a one-page agreement titled "Equity Repurchase" (the "Repurchase Agreement(s)"). (*See, e.g.*, Am. Compl. Ex. D.)

5. Holdings is governed by the Amended and Restated Limited Liability Company Agreement of Driven Holdings, LLC ("Operating Agreement"). (Am. Compl. Ex. A(2) ("Operating Agreement").) The Operating Agreement defines eleven categories of ownership interests referred to as "Units." (Operating Agreement § 2.1(b).) The agreement subjects distribution to the various classes of equity units to a defined waterfall, with the SPI Units being seventh in line. (Operating Agreement § 5.1(a).)

6. Plaintiffs allege that, on the date of the Transaction, the SPI Units had a "deemed value" of $15 million (150,000 units at $100 per unit) and that each Plaintiff became vested in those units upon consummation of the Transaction. (Am. Compl. ¶¶ 6, 8.)

7. Article VIII of the Operating Agreement governs transfers of units in Holdings. The agreement deems void any transfer that is not a "Permitted Transfer." (Operating Agreement § 8.1.) Section 8.2(a) enumerates nine types of Permitted Transfers, including a broad category that covers transfers not listed as a Permitted Transfer in other provisions of section 8.2(a) if the transfer is "permitted by a majority of the Directors of the Board who are not officers, directors or employees of, or

partners in, the Person that proposes such Transfer." (Operating Agreement § 8.2(a)(vii).)

8. The Operating Agreement also lists as a Permitted Transfer Holdings' option to repurchase units owned by Plaintiffs and other executives. (Operating Agreement § 8.2(a)(viii).)

9. The Operating Agreement attached a document titled "Annex A" for each Plaintiff. (*See* Am. Compl. Ex. B.) Each Annex A includes a provision that subjected the executive's units to Holdings' Repurchase Right (the "Repurchase Option"). (Am. Compl. ¶¶ 16, 18; *see* Am. Compl. Ex. B.) The Repurchase Option gave Holdings the right, but did not obligate Holdings, to purchase the executive's units if the executive was terminated without cause, and imposed certain conditions on Holdings' exercise of the Repurchase Option, including giving timely notice and performing a valuation. (Am. Compl. Ex. B.) Holdings had to exercise the Repurchase Option within six months of the executive's termination, and it had to value the units being repurchased under the Repurchase Option at "the Fair Market Value of the applicable Units on the date of termination of [the] Executive (as determined in good faith by the Board)." (Am. Compl. Ex. B; *see* Am. Compl. ¶ 18.)

10. Plaintiffs were terminated without cause at various times in mid-2012. (Am. Compl. ¶ 15.)

11. Ultimately, each Plaintiff other than Ken Walker transferred their SPI Units to Holdings in exchange for cash payment and a broad general release.

12.     In connection with his termination, Plaintiff Ken Walker signed a document titled "General Release By and between Kenneth D. Walker and Driven Brands, Inc.," dated July 26, 2012 (the "Walker General Release"). (Second Kurtz Aff. Ex. A ("Walker General Release").) The agreement recites that Ken Walker was not being terminated for "Good Reason" but that he would nevertheless be paid severance benefits owed only to executives terminated for "Good Reason." (Walker General Release 1.)

13.     The Walker General Release addresses the repurchase of Ken Walker's equity units. (Walker General Release § 2.) Section 2(a) of the release itemizes the various units that Ken Walker held at the time he was terminated. (Walker General Release § 2(a).) Section 2(b) defines Ken Walker's units that became vested as of his termination date and provides that all unvested units are forfeited and canceled. (Walker General Release § 2(b).) Section 2(c) identifies Ken Walker's vested units, including his SPI Units. (Walker General Release § 2(c).)

14.     As to the vested units, Ken Walker agreed that the fair market value of the SPI Units on his termination date was zero dollars, and the total fair market value of his other vested units on that date was an aggregate amount equal to $2.5 million. (Walker General Release § 2(c).) The Walker General Release further provides that "[t]he Board of Directors of the Parent shall notify [Ken Walker] of any election by Parent to repurchase the Units as set forth herein and in accordance with the terms of Annex A." (Walker General Release § 2(c).)

15.    Section 3 of the Walker General Release includes a broad release of all claims against Driven Brands and its "direct or indirect parents" for both known and unknown claims that existed on the date the agreement was executed. (Walker General Release § 3(a).)

16.    In December 2012, Ken Walker accepted a $2.5 million payment from Holdings. (*See* Am. Compl. ¶¶ 25–26, 28.)

17.    Plaintiff Rauch entered into a Separation Agreement and Release in connection with the termination of his employment with Maaco Franchising, Inc., dated August 30, 2012. (Second Kurtz Aff. Ex. B.) The agreement provides that Rauch would be paid a severance benefit. (Second Kurtz Aff. Ex. B, § 6.) With regard to his units in Holdings, the agreement identifies Rauch's various units by category, cancels those that had not vested, acknowledges that vested units were subject to the Repurchase Option in Annex A, and provides that Rauch would be notified within six months of any decision to repurchase his units. (Second Kurtz Aff. Ex. B, § 7.) The agreement acknowledges that the "Fair Market Value on the Termination Date of the [SPI Units] is zero dollars." (Second Kurtz Aff. Ex. B, § 7(c).) The agreement includes a broad release in favor of Maaco, as well as its parent and affiliates, which includes Holdings. (Second Kurtz Aff. Ex. B, § 9.)

18.    In connection with their respective employment terminations, Plaintiffs Bickers, Joel Walker, and Kirby entered into separation agreements that contained the same provisions as Rauch's separation agreement.

19. Bickers entered into a Separation Agreement and Release with Econo Lube N Tune, Inc., dated September 19, 2012. (*See* Second Kurtz Aff. Ex. B.) Joel Walker entered into a Separation Agreement and Release with Forward Development, Inc., dated August 13, 2012. (*See* Second Kurtz Aff. Ex. B.) Kirby entered into a Separation Agreement and Release with Meineke Car Care Centers, Inc., dated August 29, 2012. (*See* Second Kurtz Aff. Ex. B.)

20. In sum, Ken Walker, Rauch, Bickers, Joel Walker, and Kirby contractually agreed that, at the time their employment was terminated, the fair market value of their SPI Units was zero dollars.

21. Plaintiffs Pearce, Street, and Moran did not execute separation agreements at the time of their termination.

22. In December 2012, all Plaintiffs but Ken Walker executed a one-page Repurchase Agreement. (*See* Am. Compl. Ex. D.) The Repurchase Agreements all contain the same terms with different amounts and personal information for each Plaintiff. (Am. Compl. Ex. D.) Each Repurchase Agreement recites that the respective Plaintiff was selling all categories of his vested and unvested equity units, to Holdings for the stated purchase price. (Am. Compl. Ex. D.) The aggregate purchase price for Plaintiffs' equity interests was $4.3 million.

23. Before signing the Repurchase Agreements, each Plaintiff provided handwritten bank information to allow the purchase consideration to be wired. (*See* Am. Compl. Ex. D; Kirby Am. Compl. Ex. B; Joel Walker Am. Compl. Ex. C; Moran Am. Compl. Ex. C; Rauch Am. Compl. Ex. B.)

24.     Each Repurchase Agreement contains a comprehensive release in favor of Holdings and related parties that bars all known or unknown claims related in any way to the units, other than an action to enforce the Repurchase Agreement. (Am. Compl. Ex. D.)

25.     A cover letter accompanying each Repurchase Agreement provides that Holdings "has decided to repurchase all of your vested Units for an amount set forth in the attached repurchase agreement," and that the repurchase was timed, in part, to achieve Plaintiffs' desired tax consequences. (Am. Compl. Ex. C.)

26.     Plaintiffs contend that the purchases and releases did not extinguish their rights in their equity units because the repurchase did not strictly comply with the notice and valuation requirements of Annex A. (Am. Compl. ¶¶ 37–42.)

27.     Neither the one-page Repurchase Agreements nor the cover letters refer to Holding's Repurchase Option under Annex A or to the Operating Agreement.

28.     In 2015, Holdings paid compensation to record holders of SPI Units, and Plaintiffs contend that they are entitled to similar compensation. (Am. Compl. ¶ 43.)

29.     Plaintiffs assert a contract claim to enforce their ownership rights in the Holdings equity units. They claim that any purported transfer of those units is void unless the transfer was made through the Repurchase Option, as provided by the Operating Agreement. On that basis, they also assert claims of negligent misrepresentation, intentional misrepresentation, fraudulent inducement or concealment, mutual mistake, unilateral mistake, breach of the implied covenants of good faith and fair dealing, chapter 78A violations, and declaratory judgment.

## II. PROCEDURAL HISTORY

30. The Ken Walker Lawsuit is brought by Plaintiffs Ken Walker, Pearce, Street, and Bickers. They filed their initial complaint in the Mecklenburg County Superior Court on October 14, 2015, and filed an amended complaint on October 26, 2015.

31. Holdings timely filed a notice of designation in the Ken Walker Lawsuit on November 12, 2015. The Chief Justice designated the case as a mandatory complex business case on November 13, 2015, and the case was assigned to the undersigned on November 16, 2015. Plaintiffs in the Ken Walker Lawsuit filed a second amended complaint on December 16, 2015.

32. Plaintiffs Rauch, Joel Walker, Kirby, and Moran filed their initial complaints in the Mecklenburg County District Court on December 16, 2015.

33. On January 14, 2016, Holdings filed a consent motion in the Mecklenburg County District Court to transfer the four district-court cases to the superior-court division. Holdings concurrently filed a consent motion in this Court to consolidate the four district-court cases with the Ken Walker Lawsuit.

34. On January 15, 2016, the Court granted the motion to consolidate and designated the Ken Walker Lawsuit as the lead case in the consolidated action. The district court entered an order transferring the other cases to the superior-court division on February 2, 2016.

35. Plaintiffs Rauch, Joel Walker, Kirby, and Moran amended their complaints on March 24, 2016, and Plaintiffs in the Ken Walker Lawsuit filed a third amended complaint.

36. On April 26, 2016, Holdings moved to dismiss all claims alleged in the March 24, 2016 amended complaints on the basis that those complaints and the documents attached to them demonstrate as a matter of law that each Plaintiff has either extinguished or transferred all of their equity interests in Holdings and voluntarily executed a release that bars their claims.

37. The Motion has been briefed and argued, and it is now ripe for disposition.

## III. LEGAL STANDARD

38. On a motion to dismiss under Rule 12(b)(6), the Court considers "whether the pleadings, when taken as true, are legally sufficient to satisfy the elements of at least some legally cognizable claim." *Arroyo v. Scottie's Prof'l Window Cleaning, Inc.*, 120 N.C. App. 154, 158, 461 S.E.2d 13, 16 (1995) (quoting *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987)). The Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *Strickland v. Hedrick*, 194 N.C. App. 1, 20, 669 S.E.2d 61, 73 (2008) (quoting *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005)), and it may ignore the plaintiff's legal conclusions, *McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013).

39.     The Court will grant a motion to dismiss under Rule 12(b)(6) if (1) no law supports the plaintiff's claim, (2) the complaint does not plead sufficient facts to state a legally sound claim, or (3) the complaint discloses a fact that defeats the plaintiff's claim. *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985).

40.     In ruling on a Rule 12(b)(6) motion, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001). Likewise, the Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009). "[T]he terms of an attached exhibit control over contrary allegations in the complaint." *Highland Paving Co. v. First Bank*, 227 N.C. App. 36, 46, 742 S.E.2d 287, 294 (2013) (citing *Wilson v. Crab Orchard Dev. Co.*, 276 N.C. 198, 206, 171 S.E.2d 873, 879 (1970)).

## IV.     ANALYSIS

### A.     **Plaintiffs' Voluntary Repurchase Agreements Are Not Voided by the Operating Agreement's Provisions Regarding Permitted Transfers.**

41.     Plaintiffs contend that, under the Operating Agreement, Holdings' sole method for repurchasing Plaintiffs' equity interests was through the Annex A Repurchase Option, and any equity transfer that did not comply with the Operating Agreement is void.

**(1)** **Plaintiffs Ken Walker, Rauch, Bickers, Joel Walker, and Kirby are bound by their agreement that the SPI Units had no value at the time those Plaintiffs were terminated.**

42. If the Court first assumes, solely for purposes of Plaintiffs' argument, that the Operating Agreement restricted the transfer of Plaintiffs' units in Holdings to a repurchase through Holdings' unilateral Repurchase Option, Plaintiffs nevertheless acknowledged in their severance agreements, supported by valuable consideration, that their SPI Units, although vested, had zero value at the time their employment was terminated. Effectively, this admission rendered meaningless any subsequent exercise of Holdings' Repurchase Option as to the SPI Units.

43. The Court concludes as a simple matter of contract, and without the need to cite authority, that Plaintiffs, in exchange for valuable consideration, including payment of severance benefits, acknowledged that their unvested units were canceled and that their SPI Units should be valued at zero dollars on the date of their termination. Any subsequent purchase would be valued as of that date, as a result of which Plaintiffs no longer had any valuable right in those units, and a purchase of units at zero value would be a meaningless exercise, whether the purchase be through Holdings' Repurchase Option or through a separate voluntary transfer.

44. Plaintiffs Ken Walker, Rauch, Bickers, Joel Walker, and Kirby present no basis for setting aside their severance agreements. Accordingly, any claim that they might have otherwise had in the SPI Units is barred by the admissions and releases in their separation agreements.

**(2)  Plaintiffs' claims depend on the erroneous assertion that the sole Permitted Transfer of their units was through Holdings' Repurchase Option.**

45.  Plaintiffs premise their various claims on the assertion that the Operating Agreement restricted the transfer of Plaintiffs' units to Holdings' exercise of its Repurchase Option through Annex A, that the December 2012 Repurchase Agreements must be deemed to have integrated the Operating Agreement and Annex A, and that the transfers of Plaintiffs' units are therefore void because Holdings did not complete the purchase in strict compliance with Annex A.  (Pls.' Br. Resp. and Opp'n to Mot. Dismiss 10.)

46.  There are multiple reasons why Plaintiffs overreach when making their argument.

47.  First is the assumption that Plaintiffs could not voluntarily waive the requirements imposed by Annex A as part of a voluntary transaction by which they accepted the tendered purchase price.  Plaintiffs attempt to argue that they were improperly induced to enter into those agreements on a reasonable assumption that Holdings had first performed a valuation to determine the fair market value of the units at the time of Plaintiffs' termination when in fact no valuation was performed. That argument is particularly hollow as to those Plaintiffs that expressly acknowledged, in consideration of their receipt of severance payments and other benefits, that the SPI Units had no value at the time of their termination.

48.  Second, Plaintiffs argument that the Repurchase Agreements incorporated, and therefore had to comply with, the Repurchase Option provided by

Annex A fails for the simple reason that those documents were not incorporated, and the one-page Repurchase Agreements contain all necessary terms of an enforceable agreement to sell Plaintiffs' units for consideration. The Repurchase Agreements identify the units being purchased, specify a stated purchase price, and contain adequate language to consummate the transfer and a release of all claims.

49. "[W]here the parties have deliberately put their engagements in writing . . . it is presumed the writing was intended by the parties to represent all their engagements as to the elements dealt with in the writing." *Neal v. Marrone*, 239 N.C. 73, 77, 79 S.E.2d 239, 242 (1953) (holding that prior or contemporaneous negotiations inconsistent with a writing, or ones that "tend to substitute a new and different contract from the one evidenced by the writing," are incompetent). Separate documents may be integrated and construed together as one agreement only where they are "contemporaneously executed written instruments between the parties" that "relat[e] to the subject matter of the contract" at issue. *Carolina Place Joint Venture v. Flamers Charburgers, Inc.*, 145 N.C. App. 696, 699, 551 S.E.2d 569, 571 (2001).

50. There is no ambiguity that necessitates the trier of fact to interpret the terms of the straightforward Repurchase Agreements that Plaintiffs voluntarily executed. Under North Carolina law, "[w]hen the language of a contract is clear and unambiguous, construction of the contract is a matter of law for the court," *Hagler v. Hagler*, 319 N.C. 287, 294, 354 S.E.2d 228, 234 (1987), "and the court cannot look beyond the terms of the contract to determine the intentions of the parties," *Piedmont Bank & Tr. Co. v. Stevenson*, 79 N.C. App. 236, 240, 339 S.E.2d 49, 52, *aff'd*, 317 N.C.

330, 344 S.E.2d 788 (1986); *see also Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996) ("If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract.").

51.     Plaintiffs allege that the Repurchase Agreements "did not reflect, state or embody the agreement of the parties as expressed in and through the Stock Agreement, Holdings Operating Agreement, [Annex A], or otherwise." (Am. Compl. ¶ 27.) The Repurchase Agreements did not refer to any of those documents. The Court is not persuaded by Plaintiffs' argument that those documents were incorporated into the Repurchase Agreement because the cover letter forwarding those agreements provided that "capitalized terms used herein and not defined herein shall have the respective meanings ascribed to such terms in the [Operating] Agreement and Annex A." (Am. Compl. Ex. C; *see* Pls.' Br. Resp. and Opp'n to Mot. Dismiss 10–11.)

52.     Third, and perhaps most significantly, Plaintiffs' core argument does not square with the terms of the Operating Agreement that allowed Holdings to authorize a voluntary agreement with Plaintiffs without having to rely on its unilateral Repurchase Option.

53.     Plaintiffs persistently argue that the Operating Agreement restricts any Permitted Transfer of Plaintiffs' units to the Repurchase Option referred to in section 8.2(a)(viii) of the Operating Agreement. That argument ignores the language of section 8.2(a)(vii), which further defines a Permitted Transfer to include "any Transfer of Units not described in any of clauses (i) through (vii) [of section 8.2(a)] if

permitted by a majority of the Directors of the Board who are not officers, directors or employees of, or partners in, the Person that proposes such Transfer." (Operating Agreement § 8.2(a)(vii).)

54. Further ignoring this provision, Plaintiffs argue that they "did not know and were unaware and had no reason to know of or be aware at any time" that the Repurchase Agreements did not comply with the requirements of the Operating Agreement and Annex A. (Am. Compl. ¶ 35.) As noted, the agreements did not incorporate or depend on Annex A, and Plaintiffs must be assumed to have understood the Repurchase Agreements that they read and executed. *See, e.g.*, *Martin v. Vance*, 133 N.C. App. 116, 121, 514 S.E.2d 306, 309–10 (1999) ("[P]laintiff's execution of this document charges her with knowledge and assent to the contents of the agreement.").

55. In sum, the Operating Agreement allowed Holdings and Plaintiffs to enter into a consensual, voluntary transfer of Plaintiffs' equity units in Holdings. Plaintiffs have demonstrated no facts to support a finding that they did not voluntarily enter into their agreements, transfer their units for value, and execute comprehensive releases by which they must be bound.

**B.** **The Comprehensive Releases Bar All of Plaintiffs' Claims Related to Any Units.**

56. "Releases are contractual in nature and their interpretation is governed by the same rules governing interpretation of contracts." *TaiDoc Tech. Corp. v. OK Biotech Co.*, No. 12 CVS 20909, 2015 NCBC LEXIS 74, at *13 (N.C. Super. Ct. July 17, 2015) (quoting *Chemimetals Processing, Inc. v. Schrimsher*, 140 N.C. App. 135,

138, 535 S.E.2d 594, 596 (2000)). Thus, when the language of a release is clear, the Court cannot look beyond the language of the release to determine the parties' intent. *See Piedmont Bank & Tr. Co.*, 79 N.C. App. at 240, 339 S.E.2d at 52. As a result, the Court must construe a contract that releases "'all claims of any kind' . . . to mean precisely that: an intent to release all claims of any kind in existence." *Fin. Servs. of Raleigh, Inc. v. Barefoot*, 163 N.C. App. 387, 395, 594 S.E.2d 37, 43 (2004). "Where the execution of a release based on valuable consideration is admitted," the release is "a complete defense to an action for damages." *Talton v. Mac Tools, Inc.*, 118 N.C. App. 87, 90, 453 S.E.2d 563, 565 (1995).

**(1)** **Releases in the Repurchase Agreements**

57. The Repurchase Agreements entered into by Plaintiffs other than Ken Walker contain releases that provide that each Plaintiff

> hereby expressly and irrevocably releases and forever discharges . . . [Holdings] . . . from any and all claims, counterclaims, demands, debts, actions, causes of actions, suits, expenses, costs, attorneys' fees, damages, indemnities, obligations, losses and/or liabilities of any nature whatsoever, whether known or unknown, which [Plaintiff] ever had, now has or hereafter can or may have against [Holdings] by reason of any matter related to the Units and/or this repurchase; provided, however, that nothing herein releases any claim [Plaintiff] has or may have against [Holdings] regarding the performance or nonperformance of obligations arising hereunder.

(Am. Compl. Ex. D (stylistic emphasis omitted).)

58. The Court rejects Plaintiffs' argument that their claims are governed by the carve-out provision for "claim[s] . . . regarding the performance or nonperformance of obligations arising hereunder." (Am. Compl. Ex. D; *see* Pls.' Br. Resp. and Opp'n to Mot. Dismiss 19–20.) Holdings paid, and Plaintiffs accepted, the purchase price

stated by the agreements. Plaintiffs admit that they "received the [SPI Units] in exchange for selling their ownership interest in the company that [Holdings] acquired." (Pls.' Br. Resp. and Opp'n to Mot. Dismiss 21–22.) That admission precludes any argument that the releases fail for want of consideration. *See Harllee v. Harllee*, 151 N.C. App. 40, 49, 565 S.E.2d 678, 683 (2002) ("[T]o defeat a contract for failure of consideration, the failure of consideration must be complete and total.").

59. In sum, Plaintiffs other than Ken Walker are barred by the general release in the Repurchase Agreements, assuming that those Plaintiffs who earlier signed separation agreements still had claims to release.

### (2) The Walker General Release

60. Unlike the other Plaintiffs, Ken Walker did not execute the Repurchase Agreement. (Am. Compl. ¶¶ 21, 28–29.) He must, however, be bound by the Walker General Release that he executed on July 26, 2012.

61. As stated above, in section 2 of the Walker General Release titled "Repurchase of Units," Ken Walker acknowledged that the SPI Units had a value of "zero dollars" at the time he was terminated and that the aggregate value of his other equity interests was $2.5 million. (Walker General Release § 2(c).) He later accepted Holdings' payment of $2.5 million.

62. The Walker General Release was supported by consideration, including payment of severance compensation. That consideration was adequate to support the general release contained in section 3, by which Ken Walker "knowingly and

voluntarily releases and discharges" the released parties, "to the fullest extent permitted by law,"

> of and from all actions, agreements, claims, damages, expenses (including attorney's fees and costs), judgments, liabilities, obligations or suits of any kind whatsoever, in law, equity or otherwise, in any jurisdiction, whether known or unknown, suspected or claimed, specifically mentioned herein or not, which [Ken Walker] had, has or may have against any of the Released Parties by reason of any actual or alleged act, event, occurrence, omission, practice or other matter whatsoever from the beginning of time up to and including the date that [Ken Walker] signs this General Release.

(Walker General Release § 3(a).)

63.     Although the Walker General Release was executed between Ken Walker and Driven Brands, the language of the release extends to Holdings as the direct or indirect parent of Driven Brands.

64.     The Court concludes that the Walker General Release bars Ken Walker's claims.

**C.     <u>Plaintiffs' Remaining Claims Depend on the Erroneous Assertion that the Repurchases Were Not Authorized Under the Operating Agreement.</u>**

65.     In addition to the breach-of-contract claim, which the Court finds cannot be sustained, Plaintiffs assert claims for negligent misrepresentation, intentional misrepresentation, fraudulent inducement or concealment, mutual mistake, unilateral mistake, breach of the implied covenants of good faith and fair dealing, chapter 78A violations, and declaratory judgment.  The allegations in the amended complaints make clear that those claims depend on Plaintiffs' transfers being voided

by failure to comply with Holdings' Annex A Repurchase Option and the Operating Agreement. For example:

- Plaintiffs' claims for fraud and misrepresentation allege that Holdings misrepresented that it "had duly performed the requirements under Annex 'A' applicable to valuation of each of Plaintiffs' classification of equity." (Am. Compl. ¶ 45(a); *see also* Am. Compl. ¶¶ 45, 56, 59–60.)

- Plaintiffs' claim for securities violations under chapter 78A relates to their "full and reasonable reliance on Defendant's good faith compliance with its contractual obligations under Annex 'A.'" (Am. Compl. ¶ 104.)

- Plaintiffs allege that Holdings breached the implied covenants of good faith and fair dealing by failing to perform its "contractual obligation to Plaintiffs to value Plaintiffs' equity," including the SPI Units, "as set forth in Annex 'A.'" (Am. Compl. ¶ 81(a).)

66. Having rejected the critical assumption on which Plaintiffs' claims other than the contract claim rest, those claims also should be dismissed.

## V.    CONCLUSION

67. For the reasons stated above, Holdings' Motion is GRANTED, and all claims in each of the cases in this consolidated action are DISMISSED WITH PREJUDICE.

SO ORDERED, this the 7th day of August, 2017.


                     /s/ James L. Gale
                     James L. Gale
                     Chief Business Court Judge